Cowen, J.
The objection that the- plea omits, to. allege, a decreé declaring Yisser a bankrupt, or that his petition was filed, seems to be unfounded in fact.- Both.are at least argumentatively averred; and no special cause is assigned by the demurrer against that form of pleading them. The demurrer being general in this respect, it is enough for the defendant if his plea be good in substance.
By the constitution of-the United States congress have power-to establish uniform laws on the subject of bankruptcies throughout the United States. The late bankrupt act was professedly an execution of this power. The defendant, not averring himself to have been a merchant or trader, was, on his own petition, declared a bankrupt and discharged as such. - A question is’ made whether the power conferred by the constitution covers such a case, or whether it be not confined to merchants or traders, and. what is considered a bankrupt discharge in the more strict sense, viz. one obtained after a. distribution of the trader’s property at the suit of his creditors.
- In considering this question it becomes material to ascertain the ordinary acceptation of the term bankruptcy at the time when the constitution was adopted. Were its adoption of recent date, probably no one would entertain a doubt. We say a man is bankrupt when he is unable to pay his debts; and this would be predicable in common parlance of every one, as well of a mechanic, a *320 professional man or a farmer, as of a merchant or trader. Webster, though he says that in strictness no one but a trader can be a bankrupt, defines the word bankruptcy thiis, “ The state of being a bankrupt, or insolvent; inability to pay debts." His adjective bankrupt is, “unable to pay just debts; insolvent:” his verb bankrupt, “ to make one insolventpast participle, “ rendered insolvent:” present participle, “ rendering insolvent.” The more reliable definitions of commercial lexicography are the same. M’Culloch, (tit. Bankrupt and Bankruptcy,) says, “ In the general sense of the term, bankrupt is equivalent to insolvent, and is applied to designate any individual unable to pay his debts.”
The older lexicographers and those from whom the word was doubtless transferred into the constitution, treat it as exactly commensurate with insolvency. The following are the definitions of the word bankrupt by Ash, who wrote his dictionary several years before our revolution: Adj. “ Broken for debt; incapable of payment; insolvent:” Subst. “ A person incapable of paying his debts :” Verb, “ To break a person; to render a person incapable of paying his debts.” He defines bankruptcy as being “ the state of a bankrupt.” Johnson carries the definitions through the various parts of speech to the same effect. Adj. “ In debt beyond the power of paymentSubst. “ A man in debt beyond the power of paymentVerb, “To break, to disable one from satisfying his creditors.” He instances Shakspeare: “ The king’s grown bankrupt, like a broken man.” Bankruptcy being the status, of course follows the nature of its primitive. In short, bankruptcy is an ancient English word, which has come down to us, at least from the time of Elizabeth, bearing all the way a meaning co-extensive with insolvency, and it was especially equivalent to that word when the constitution was adopted. We were referred to Webster as narrowing the word bankrupt to an insolvent trader. He does so indeed, following Blackstone, whose definition does not pretend to give the general sense. The latter wrote, for students of the English law, and of course took the statute definition as it stood in the time of Elizabeth, or had been expanded by subsequent legislation or judicial construction. Webster himself thus treats the term as one of *321 legal art, entirely destroying the harmony of signification between the substantive and its kindred words in other parts of speech. In defining the status, for instance, he follows Ash and Johnson.
A man is insolvent when he is unable to pay his debts; and is regarded as in a state of insolvency by the law. (See 2 Bell’s Com. 162. )(b) Notorious insolvency, according to this commentator, whether of a trader or other person, is properly termed bankruptcy. (Id.) He is, however, speaking particularly of the Scotch law; and the remark goes for little more than a confirmation of the general definition.
Looking thus at the uniform popular acceptation of the word from the earliest times and in all English countries, and supposing that to be the true one, I read the constitution thus: “ Congress shall have power to establish uniform laws on the subject of any person’s general inability to pay his debts throughout the United States.” I do not deny that if we were bound to apply the English statute definition of the word bankruptcy, the power of congress would be unequal to the discharge here pleaded, in two respects. In 1787, bankruptcy was, under that statute, not predicable of persons generally, but only of certain classes, such as those who made their living by buying and selling. The word moreover implied, at that time, the state of a person in the class mentioned pursued by his creditors, arrested in his business, and compelled, in invitum, to surrender the administration of his estate to trustees for the use of his creditors. When he came for such a surrender &c. of his own head, he was called in legal language an insolvent • and the status of insolvency thus came, in a technical sense, to be distinguishable from that of bankruptcy. By loolring into Jac. Law Diet., titles Bankrupt, Insolvent Debtors, and their kindred heads, any one will see the distinction. It was no doubt perfectly familiar with many of those who framed the constitution, and probably became so with all in the course of debate; a consideration which led a distinguished judge, and probably others with him, to doubt whether the convention did not express themselves with *322 a view to the distinction, and whether a bankrupt law extending to every description of persons would comport with the spirit of the constitution. (See per Livingston, J in Adams v. Storey, 1 Paine's Rep. 81, 2.) All or most of the states also had themselves passed laws for the relief of insolvent debtors, distinguishable from the English act in not being confined to traders or any particular class, and in being available for the purposes of a qualified discharge from debts on the voluntary application of the debtor. These laws had been in operation for a long time mider the name of insolvent laws; and it may be supposed that had the convention intended, to cover all this ground, they would have used terms indisputably adequate, instead of a word justly open to the charge of ambiguity, accordingly as it is regarded in its popular and general meaning on one side or its technical meaning on the other. This is the sum of the argument which I understand now to be advanced by the counsel for the plaintiffs. So far as it rests on the probability that a more obvious phrase would have been selected if the larger sense had been intended, it seems to be entirely neutralized by the reply that, had the convention intended to avoid an application of the power to cases of insolvency, they never would have consented to the use of a term which, in the general vocabulary of the English language, clearly embraced such cases. The argument is but conjectural, and we are thrown back upon the more sensible rules of interpretation. It seems to me too that there is something quite forced and unnatural in supposing that the members of the convention intended to contract the action of congress on the subject of bankruptcies within a limit narrower than that allowed by the British constitution; above all that they intended to hamper that body by the letter of the statute, when it was well known that British legislation had already extended itself in one case, and might thereafter, as it has in fact done, extend itself to other cases not then provided for. I allude to the 34 and 35 H. 8, ch. 4, and the 6 Geo. 4, ch. 16, the first of which comprehended all classes of persons,' as well traders as others, and the latter introduced the right of a trader voluntarily to declare himself a bankrupt. The argument is repugnant to *323 the whole spirit of American legislation. It moreover supposes the convention, while engaged in framing a fundamental law, to have been utterly regardless of those obvious vicissitudes in a world full of changes, which might call for a corresponding enlargement or contraction of the bankrupt system.
Having rescued the case from what at most can be regarded as an argument founded on a very improbable assumption, we have disposed of every thing urged by counsel against a resort to the rule which looks to the independent meaning of the word. We are referred to nothing extrinsic, nothing in the context, nor am I aware of any thing which can be adduced to control that meaning. This renders the debateable ground exceedingly narrow. It reduces the whole to the mere question whether, as between the broad and popular interpretation on the one hand, and the narrow artistly interpretation on the other, the former or the latter is to prevail. I concede all that is claimed on the assumption that the word bankruptcy is used in a technical sense. Words thus used—for instance, those conferring a right to the privilege of habeas corpus or employed in the distribution of jurisdictional power—must, in the nature of the thing, be read in the light of the definitions affixed to them in the art or science from which they are borrowed. I go on the contrary assumption. The convention were, in the matter before us, speaking through a permanent law to a great nation, from the general vocabulary of that nation. They use a term which, as defined in that vocabulary, clearly comprehends the case of the defendant. This being so, I shall not stop to vindicate the perfect good sense of the known rule that the speakers must be understood accordingly. Nor shall I quote writers at large to a point in which they all agree. The rule, in connection with the qualification I have just now mentioned, is stated in 1 Black. Comm. 59, thus: “ Words are generally to be understood in their visual and vnost known significations; not so much regarding the propriety of grammar as their general and popular vise.” The application of this rule to words used in the constitution of the United States, has sometimes been combated on the theory of strict construction ; a perfectly sound theory, when it *324 insists that no power unless plainly expressed or necessarily implied shall be considered as granted. When it goes farther, and undertakes to turn words obviously used in a general sense into words of art, thus fettering the action of congress by interpolating a rule of construction equally repugnant to good sense and sound law, and all that has been said by commentators, to such an anomaly, I answer in the words of Chief Justice Marshall : I “ cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the constitution is to be expounded. As men whose intentions require no concealment generally employ thé words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it,must be understood to have employed words in their natural sense, and to have intended what they said.” (Gibbons v. Ogden, 9 Wheat. 188.) The subject in respect to which uniform laws are authorized, is bankruptcy throughout the United States; synonymous with insolvency. The power conferred is without restriction, save in its uniformity. It is plenary (9 Wheat. 196,7) and, in reference to its subject, may be exercised with the same latitude as the like power has been and may be by the British parliament. The statute in question is, therefore, not objectionable because it deals with a greater number of debtors, with greater liberality towards them, and works greater mischief to creditors than a more restricted system. If the statute was pernicious or even wicked, it has paid the penalty of its mischief by death; and it is a pleasure to learn that, while conceding to congress its legitimate power, the country sees little to fear from the perverseness of the agents to whose hands the power is confided; that it learns -from the enactment and repeal of the law in question, the safety of that principle in the constitution without which many of the powers conferred by it would become intolerable in their exercise, theprinciple which secures a proper degree of influence to the constituent. ' •"
While this cause lay under advisement, I received the opin- • ion of Mr. Justice Catron of the supreme court of the United *325 States, in Klein’s case, (1 How. Rep. 277,) sustaining the bank-rapt act as within the constitutional power of congress.
I have thus far considered the question independently of what was barely thrown out by the counsel for the plaintiffs, but which he declined to discuss, though he thought the question might admit of doubt, viz. whether congress have power to pass a law impairing the obligation of contracts; and if they have not, whether the bankrupt law may not be void as working that effect.
The constitution proceeds by enumeration of powers, among which is not to be found any authority to legislate upon the subject of contracts generally; and I hope I shall be among the last to concede that congress may work the nullity of contracts or detract any thing from their obligation eo nomine. The directly granted power over bankruptcies, however, carries the incidental authority to modify such obligation so far as the modification may result from a legitimate exercise of the delegated power. Having satisfied myself that it is plenary, and, with a single qualification—viz. unifoi'mity—entirely equal to the power of parliament, I shall devote very little time to the enquiry what that may be. No one will deny that parliament may modify and discharge the obligation of contracts in exercising its powers over bankrupts and their creditors. Such a power is indeed prohibited to the states, the restraint upon which is more absolute for the want of unqualified power to pass bankrupt laws. Yet even these are allowed to. subvert, through such laws, the force of contracts made after the date of the statute by which they are sought to be overthrown. If I am right in supposing that the meaning of the word bankruptcy is co-extensive with that of insolvency, or even if it be narrowed to traders, there is no color of principle that I am aware of which questions a bankrupt discharge from a past and subsisting contract any more than a future. The subject is the insolvent debtor, the distribution of his effects in some way among his creditors, and. the final discharge from all his debts. The strong probability to my mind is, that the convention intended to do what I think they have done expressly; prohibit this general power to the states, and confer it on congress. Whether they were called *326 upon by the history of the times or any other consideration to limit the action of congress to prospective contracts, was for them and the states which adopted their act to decide. It is enough for the purposes of this defence to say that power over bankruptcies has been granted, unlimited except in a particular having no respect to the question depending. In the language of Chancellor Kent, “ There being no constitutional objection to the statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power of .any other government.” (Kents Comm. 448, 4th ed.)
It is not denied by counsel that the words of the statute clearly indicate an intention in congress to legislate concerning debts contracted antecedent to and subsisting at the time of the act, as well as those which might thereafter be created. This is, I think, apparent, not only from various provisions of the statute itself, but the well known causes which led to its enactment. I admit the value of the rule that general words in a statute, which may be satisfied by being allowed to operate on contracts made subsequent to its passage, should, in their application, be limited to the latter. The rule, however, is not a limitation of legislative power. It is one of judicial construction, and ceases to operate when the language is express, or the intention to affect both classes of contracts is plain. I was by no means prepared to suppose there could be any difference of opinion on the bankrupt act in this respect, till I came into conference with my brethren concerning the demurrer in Sackett v. Andross. Nor do I now propose to discuss the question at large. Could I, under any circumstances, be brought to entertain a doubt, I should feel myself bound to yield it on .what I understand to have been the construction uniformly given to the statute by the various courts of the United States which are commissioned by it to grant discharges.
The third objection, however, viz. that the defence, having arisen after the commencement of the suit, should have been pleaded in bar of its further maintenance, and not in bar generally, is, I think, well taken. The reason why a bankrupt discharge was treated as an exception to this rule in Harris v. *327 James, (9 East, 82,) seems to have been founded on provisions peculiar to the English bankrupt act. (See Lord Henley’s Dig. Bankr. Law, 425, 3d ed.) The defect however is technical, and the defendant may amend; but the ground being pointed out by the demurrer, the amendment must he on payment of costs.
Nelson, Ch. J. concurred.

 See Herrick v. Borst & Warnick, (4 Hill, 650.)